IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**AMERICAN EXPRESS FINANCIAL**                                                                 **PLAINTIFF**
**ADVISORS, INC.**

**v.**                       **NO. 4:05CV00936 GTE**

**DWIGHT KEITH HAZLEWOOD**                                               **DEFENDANT**

## MEMORANDUM OPINION

This federal court proceeding was filed on June 29, 2005. The sole relief being sought by the Plaintiff American Express Financial Advisors, Inc. ("AEFA") is the entry of a preliminary injunction, the objective of which is to maintain the status quo pending the resolution of the underlying contractual and other issues which are to be dealt with in a National Association of Securities Dealers, Inc. arbitration. For the reasons stated herein, the Court concludes that the Plaintiff AEFA has failed to carry its burden of proof with regard to demonstrating entitlement to a preliminary injunction. Its motion will therefore be denied.

### I. BACKGROUND

The file reflects that on June 28, 2005, the Plaintiff filed a "Statement of Claim" with the NASD, apparently incorporating all of the allegations being made in this federal court proceeding. That Statement of Claim requests expedited treatment under NASD Rule 10335. More specifically, the Statement of Claim requests the following injunctive relief:

    A. Direct Hazlewood to cease using AEFA's confidential client information and soliciting AEFA clients and affiliates;

    B. Direct Hazlewood to immediately return all originals and copies of AEFA documents, including all AEFA client records, financial plans, financial inventories and AEFA computer software, in Hazlewood's possession or control.

- 1 -

  C. Enjoin Hazlewood, his agents, servants, employees, officers, attorneys, successors, and assigns, and all persons, firms, and corporations acting in connection or participation with them or on their behalf, from:

    i. For a period of one year, directly or indirectly, soliciting any further business from any AEFA client whom Hazlewood served or whose name became known to Hazlewood while he represented AEFA;

    ii. Revealing or disclosing in any manner information contained in the records or files of AEFA, including the names, addresses, or any financial information of any AEFA client whom Hazlewood served or whose name became known to Hazlewood while he represented AEFA;

    iii. Encouraging or inducing any AEFA client whom Hazlewood served or whose names became known to Hazlewood while he represented AEFA, who has not already transferred their accounts from AEFA to terminate any agreement or relationship with AEFA or to withdraw any investment or account currently with AEFA for one year.

  D. Grant such other relief as the Panel deems appropriate.

The Plaintiff seeks essentially the same injunctive relief in this federal court proceeding.

## II. JURISDICTION

Plaintiff's Complaint states federal jurisdiction as follows:

This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332, by reason of the diversity of citizenship of the parties and that, without the granting of injunctive relief, AEFA will suffer irreparable harm and damages in an amount in excess of $75,000, exclusive of interest and costs.

The Court noted in an on-the-record pre-hearing telephone conference that this is not the usual diversity case because the underlying controversies will be resolved in arbitration pursuant to the agreement of the parties, *i.e.*, not in this Court.[1]  Of course, the amount in controversy in the NASD arbitration is obviously in excess of $75,000. But, as a predicate for this Court's

---

[1] As stated by Plaintiff in its brief in support of its motion: "Because the parties in this matter are members of, or affiliated with, the National Associates of Securities Dealers ("NASD"), this motion is the one and only time this Court should have contact with this matter." (Plaintiff's Brief at p. 2, fn 1).

diversity jurisdiction it is alleged that AEFA will suffer irreparably harm and damages in an amount in excess of $75,000 unless the Court grants the injunctive relief requested. In other words, the damages forming the basis for the jurisdictional amount are prospective. These damages will, according to Plaintiff's allegations, occur only if the Court declines to issue the requested injunction. The Defendant has not objected to the Court's jurisdiction and, of course, there are many cases in which jurisdiction in federal courts has been exercised in such circumstances, albeit without any specific discussion of the amount in controversy issues. The Court will proceed on the assumption of its jurisdiction.

### III. LEGAL STANDARD

The standard for granting preliminary injunctive relief is set forth in the case of *Dataphase Sys., Inc. V. C.L. Sys., Inc.,* 640 F2d. 109, 113 (8th Cir 1981) (*en banc*). Essentially the party seeking such relief must prove four factors to the satisfaction of the Court.

(1) The threat of irreparable harm;

(2) The probability that it will prevail upon the merits of its claim;

(3) That the harm it will suffer if the preliminary injunction is not granted out weighs the harm that the adverse party will suffer if the injunction is granted; and

(4) The public interest.

As stated in *Dataphase*, "the question is whether the balance of equities so favors the movant that justice requires the Court to intervene to preserve the status quo until the merits are determined." *Id*. The Court has broad discretion when ruling on motions for preliminary injunctions.

The parties cannot by contract <u>require</u> a Court to recognize any particular equitable remedy in the event of a breach of that contract. *Franklin Point, Inc. v. Harris Trust,* 660 N.E.

2d 204, 208 (Ct. App. Ill 1995). As stated in the Restatement of Contracts § 359 Comment A. (1981): "Because the availability of equitable relief was historically viewed as a matter of jurisdiction the parties cannot vary by agreement the requirement of inadequacy of damages." In this connection the Court concludes that the following language found in paragraph 19 of the Franchise Agreement, *to-wit*:

> Independent Advisor expressly agrees that the existence of any claims it may have against AEFA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement of AEFA of the covenants of Section 19.

is not binding upon this Court if the Court finds that the Plaintiff may have been the first in breach of the contracts at issue, or if the Court is left in doubt as to the enforceability of the covenants at issue. The Court also notes that it will not have a final say on the enforceability of the covenants contained in these contracts or on the right to permanent injunctive relief since such issues, as a final matter, are reserved to the arbitration forum as agreed to by the parties.

The Defendant, Dwight Keith Hazlewood, became a financial advisor with the Plaintiff corporation on September 10, 1997. On July 25, 2001 the Defendant opted to change his relationship with the Plaintiff by entering into a franchise agreement with the Plaintiff. That agreement is thirty-five pages in length.[2] As a franchisee of AEFA, Mr. Hazlewood was

---

[2] A copy of Mr. Hazlewood's American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement is submitted with Plaintiff's motion, attached to the Affidavit of Timothy B. Crain and marked as Crain Exhibit A. Said document will be hereinafter referred to as "the Franchise Agreement." A copy of a document entitled "Addendum 3-T (Employee to Franchise Transitions)" is submitted with Plaintiff's motion, attached to the Affidavit of Timothy B. Crain and marked as Crain Exhibit B. Said document will be hereinafter referred to as "Addendum 3-T." Both the Franchise Agreement and Addendum 3-T were signed on the same day and became effective July 25, 2001.

The key provisions most directly in issue here are paragraph 18, "Obligations upon Termination or Expiration" and paragraph 19, "Covenants" of the Franchise Agreement and also paragraphs 1, 2, 6, 10, 12 and 13 of Addendum 3-T. The Court notes particularly the following language in paragraph 19, "Covenants":
• Independent Advisor agrees that to the fullest extent permitted by applicable law,

- 4 -

authorized to use the AEFA and American Express trademarks, marks and logos.

On June 16, 2005, Defendant advised his supervisors as follows:

I, Keith Hazlewood, hereby terminate my employment with American Express Financial Advisors effective today June 16, 2005, at 6:00 a.m. I am very uncomfortable with the spin-off and name change and feel the direction of the new company is not something I want to be a part of moving forward.

---

AEFA will be entitled to injunctive relief from a court or NASD arbitration should Independent Advisor violate any of the covenants in this Section 19 and in Sections 10 and 18 (the "Sections") of this Agreement. Independent Advisor recognizes that AEFA's remedies solely at law will be inadequate, that AEFA will be irreparably harmed by violations of the provisions in the Sections, and thus that AEFA will be entitled to injunctive relief to prevent future violations of the provisions in the Sections until a full and final resolution of any dispute may be had on the merits. If Independent Advisor has signed Addendum No. 3 but fails to comply with it, AEFA shall be entitled to immediate injunctive relief to enforce at AEFA's option, the covenants in Section 19, including 19(a)(1), (2), (3), and (4) and/or of Addendum 3. AEFA has the right to seek such injunctive relief in a court of competent jurisdiction, which relief shall extend until, and if, a decision on the merits of the same issue is rendered by an NASD arbitration panel. Such election by AEFA to seek judicial relief shall not waive any rights AEFA may have to arbitrate disputes arising under this Agreement, including rights to obtain damages from Independent Advisor in arbitration for violation of this Agreement.

The Court also notes the following language in paragraph 12 of Addendum 3-T:

Injunctive Relief. If AEFA has a reasonable basis for concluding that the Advisor has not timely or fully complied with one or more of the requirements of this Addendum, notwithstanding an Advisor's alleged compliance, Advisor agrees that AEFA shall immediately be entitled to a forty-five (45) day injunction which enforces fully the terms of the Franchise Agreement including the Restrictive Covenant. AEFA shall be entitled to a Temporary Restraining Order or Preliminary Injunction from a court of competent jurisdiction, for fifteen (15) days, pending a decision on the merits by an NASD arbitration panel, further emergency injunctive relief of at least thirty (30) days from an NASD expedited arbitration panel, and, thereafter, or contemporaneously, as part of any injunctive award, enforcement of the full Restrictive Covenant, from an NASD panel of arbitrators. The filing by Advisor of an NASD arbitration claim, seeking to declare any part of this Addendum or the Franchise Agreement invalid or unenforceable, shall be conclusive proof of a violation of and intent to violate such Agreements and a basis for immediate court ordered injunctive relief in favor of AEFA, upholding the Franchise Agreement, pending a decision on the merits by an NASD arbitration panel.

## IV. DISCUSSION OF *DATAPHASE* FACTORS

### (1) Threat of Irreparable Harm

In applying the *Dataphase* factors, this Circuit has repeatedly emphasized the importance of a showing of irreparable harm. *See Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir.1996) (*quoting Beacon Theatres, Inc., v. Westover,* 359 U.S. 500, 506-07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.")); *Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir.1999) (same). "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Velek v. Arkansas,* 198 F.R.D. 661, 663 (E.D. Ark. 2001)(citation and internal quotes omitted).

The Court finds from the evidence that the Defendant has returned to the Plaintiff all of his customer files and customer records and that the Plaintiff has purged all of the Defendant's computer files. Mr. Hazlewood has also ceased using any telephone and/or facsimile numbers that he used while affiliated with Plaintiff. The Plaintiff's remaining objective is to prevent Mr. Hazlewood from contacting and soliciting for a period of one year the clients he served while operating as Plaintiff's franchisee that he has not already contacted.

The Court finds and concludes on the basis of the entire record that Plaintiff has an adequate remedy at law in that it may pursue in the arbitration proceeding any claims for damages arising out of Mr. Hazlewood's breach of his contract obligations whether those breaches occurred before, or will occur after, the date of this ruling. This is a classical breach of contract case. The stipulation to the contrary contained in the agreements can not alter the true effect on the Plaintiff resulting from the Defendant's past or future violations of the terms of the agreements.

As stated in *Morgan Stanley DW, Inc. v. Frisby*, 163 F.Supp.2d 1371 (N.D. Ga 2001):

> Second, Morgan Stanley cannot demonstrate irreparable harm because any injury it may suffer due to actions allegedly taken by Defendants is compensable by the award of money damages. The United States supreme Court has stated that the mere loss of income, no matter how great, does not constitute irreparable harm:
>
>> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.
>
> *Sampson v. Murray,* 415 U.. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (citation omitted) (emphasis in original). Moreover, Judge Shoob of this Court denied a similar motion on these grounds. Judge Shoob, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. V. De Liniere,* 572 F.Supp. 246 (N.D.Ga. 1983), expressly rejected the argument that a brokerage firm suffers anything other than economic loss when a departing broker seeks to solicit and service his clients:
>
>> [T]he Court finds that any loss of business to Merrill Lynch may be adequately redressed with money damages for breach of contract. The only possible irreparable result would be some vaguely defined loss of business momentum but the Court finds that to be unrealistic in the securities field. The real loss is in commission revenue generated by [the departing broker] from former . . . customers, and that can be readily calculated from the commissions he and his new firm derived from [those customers].
>
> *Id.* at 249. The cognizable injury to brokerage firms such as Plaintiff is lost commissions. Money damages easily compensate Plaintiffs for this type of loss.
>
> The securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from Morgan Stanley is documented. Every executed trade is recorded. Eery dollar earned in fees by Defendants Frisby and Lovell doing business with those customers that Morgan Stanley considers its own can be traced precisely. Any loss Morgan Stanley might suffer as a result of Defendants' departure is calculable. *Merrill Lynch, Pierce, Finner & Smith v. Bennert,* 980 F.Supp. 73, 75 (D.Me. 1997) (damages caused by the exodus of multiple brokers to a competing brokerage firm could be calculated by evidence of past history of the earnings on accounts and expert testimony). Plaintiff has failed to demonstrate irreparable harm if a temporary restraining order is not issued.

*Frisby*, 163 F.Supp.2d at 1376.

The Court finds very persuasive the above quoted reasoning by the court in *Frisby* and adopts it here.[3] The Court acknowledges that there is authority to the contrary, but it respectfully disagrees therewith.

**(2)** **Likelihood of Success on the Merits**

During the hearing conducted in this matter, the Plaintiff's counsel provided the Court with two press releases – the first dated February 1, 2005, and the second dated May 25, 2005 – explaining a contemplated major change in the relationship between the Plaintiff AEFA and the American Express Company. From those submissions, it appears that the Plaintiff has been, and at this point still is, a wholly owned subsidiary of the American Express Company. On February 1, 2005, the American Express Company announced plans to "spin off" to its shareholders 100%

---

[3] The Court relies on *Frisby* fully cognizant of the subsequent NASD Rule changes with regard to the availability of temporary injunctive relief in the arbitration proceeding itself. As an independent basis for finding no irreparable harm, the *Frisby* court noted:

> In the Court's opinion, Morgan Stanley has an adequate legal remedy immediately available to it in the form of an expedited injunctive relief hearing before the NASD. There is no dispute that the merits of this action will be decided by the NASD arbitration panel. The NASD Code, moreover, provides that, after one but not more than three business days, a single arbitrator must hear any emergency application fro injunctive relief. NASD Code, § 10335 . . . . At a hearing for injunctive relief before the NASD panel, Morgan Stanley may obtain precisely the same injunctive relief it seeks from this Court.

*Frisby*, 163 F.Supp.2d at 1375.

The *Morgan Stanley* case was decided in the year 2001. At that time Rule 10335 of the NASD Code of Arbitration Procedure provided for temporary injunctive orders. However, that Rule was changed effective March 25, 2002. Under the new Rule, temporary injunctive relief is not available in arbitration although the parties may seek, as the Plaintiff has here, temporary injunctive relief in a Court of competent jurisdiction. Nevertheless, parties to intra-industry cases may still seek before the arbitrators permanent injunctive relief and may request an expedited hearing thereon as they have in this case. Although the parties may not receive an expedited arbitration proceeding if this Court denies injunctive relief, all of the injunctive relief issues can be raised and dealt with in the arbitration proceeding.

of the common shares it holds in American Express Financial Corporation, through which the financial advisors' business is conducted. Then, on May 25, 2005, it was announced for the first time that, as part of that spin off from American Express, the Plaintiff AEFA would "adopt the new name Ameriprise Financial." It was also noted that the transaction was expected to be completed in the third quarter of 2005 and that the company would begin operating under the Ameriprise Financial brand on August 1, 2005. The press release states that, "the new Ameriprise Financial logo is based on a compass, symbolizing how the company provides direction and helps its clients navigate their financial futures." According to the February 1, 2005 press release:

> The two companies will be independent, have separate public ownership, boards of directors and management. They will enter into exclusive marketing affiliations that will allow the AEFA to continue to use the American Express name for a transition period following completion of the spin off.

In a letter to the Plaintiff's customers, notice was given of the name change by the following remarks: "I'm excited that on August 1, 2005, our name will change to Ameriprise Financial. Our new name reflects our 110 year history as well as the independent enterprising spirit of our company and our clients." (Sample Client Letter, Defendant's Exhibit 5). At the bottom of the letter is the following remark: "AEFA is a wholly owned subsidiary of American Express Financial Corporation, which will become Ameriprise Financial, Inc."

Mr. Hazlewood argues in this connection:

> In contrast to the widely known and highly touted American Express mark, the Ameriprise mark is unknown and worthless as a marketplace identifier. This name change frustrates one of Mr. Hazlewood's principal purposes for entering the franchise agreement: brand recognition.

(Defendant's Response to Plaintiff's Motion at p. 2). The Defendant argues that AEFA's name change renders the Franchise Agreement unenforceable for two reasons, one, because it frustrates

- 9 -

the purpose of the contract, and two, because the change of marks constitutes an anticipatory breach. (Defendant's Response at pp. 10-14). Thus, Defendant contends that AEFA is not likely to succeed on the merits, but instead is likely to fail.

The Court concludes that the Defendant has raised serious questions concerning the enforceability of the Franchise Agreement and Addendum T-3. As stated in *Pieper, Inc. v. Land O' Lakes Farmland Feed, LLC*, 390 F.3d 1062, 1065 (8th Cir. 2004)(citation omitted), frustration of purpose will excuse contract performance when "(1) the party's principal purpose in making the contract is frustrated; (2) without that party's fault; (3) by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made." To determine the fundamental assumptions of the contract, a court may consider the terms of the contract, the surrounding circumstances and all necessary inferences.

Here, we are dealing with more than a change in name. Defendant was confronted with the Plaintiff's complete severance from American Express Company, a highly regarded and internationally known company whose very name carries immense cachet. The first page of the Franchise Agreement states: "The distinguishing characteristics of the System include a well-recognized brand; distinctive products and services . . .[and] the System is identified by trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, the mark 'American Express.'"

The Defendant argues as follows in its brief:

Franchise is defined as "to grant (to another) the sole right of engaging in a certain business . . . using a *particular* trademark in a certain area." Black's Law Dictionary 668 (7th ed. 1999). Under the Arkansas Franchise Practices Act a franchise is defined as "a written or oral agreement . . . in which a person grants to another person a license to use a trade name, trademark . . . ." Ark. Code Ann. § 4-72-202(1)(A) (West, WESTLAW current through November 2, 2004). Under both these definitions, it is apparent that the fundamental purpose of a franchise is for a right to use a certain, specific and definite trade name or mark, rather than a

- 10 -

> right to use a floating, ever-changing mark which at anytime the franchiser may change.
>
> American Express may argue that Section 8 of the Franchise Agreement gives it the right to change the name of the franchise system. That paragraph provides: "AEFA reserves the right to substitute different proprietary marks for use in identifying the System." However, this "reservation of right" not only conflicts with the portions of the Franchise Agreement already mentioned, it also conflicts with the Uniform Franchise Offering Circulation ("UFOC") that was provided to Mr. Hazlewood by American Express.
>
> Page 53 of the UFOC, attached hereto as Exhibit D, provides that American Express will only substitute marks if it determines that a change in marks "will be beneficial to the system, or if the Proprietary Marks can no longer be used." American Express certainly cannot argue in good faith that changing its mark from an internationally known mark to an unknown mark was good for the franchise system, and there is no reason that the current mark can no longer be used. Therefore, American Express has breached the promises and representations embodied in the UFOC.
>
> The primary purpose of the Franchise Agreement was fundamentally frustrated when American Express announced its intention to change its name to an unknown, unbranded trade name that had no associated goodwill. If Mr. Hazlewood wanted to conduct a business without a brand name, he would have gone into business for himself and certainly would not have agreed to the restrictive covenants contained in the franchise agreement absent the security of band recognition.

(Defendant's Response, pp. 11-12).

With respect to Defendant's argument that the change of marks constitutes an anticipatory breach, it is enough for the Court to note that Defendant here also has raised a serious issue.

The Defendant argues too that the Plaintiff constructively terminated its agreements with the Defendant. *See Petereit v. SB. Thomas, Inc.*, 63 F3d 1169, 1182 (2nd Cir. 1995). In *Petererit*, the Second Circuit remanded the case to the trial court for a factual determination of whether constructive termination had occurred. While rejecting the view that any reduction of income due to a franchisor's action would support a claim for constructive termination, the court also rejected as too narrow a "near destruction" requirement. *Id.* at 1182. The court commented: "A

- 11 -

franchiser may take action that results in less than the complete destruction of a franchisee's business, but yet so greatly reduces the value of the franchise as to epitomize the very abuse of disparity in economic power that the [Connecticut Franchise] Act seeks to prevent." *Id.* In this context, the Court also noted:

> We note initially that while some plaintiffs are parties to written agreements allowing alterations to their territories, such agreements do not preclude a finding of constructive termination. The Act contains a non-waiver provision that prevents parties from contracting out of its protections. Conn.Gen.Stat. § 42-133f(f). Where a realignment of territories has such a substantial effect as to be a constructive termination, a contractual reservation of the power to realign territories cannot displace the statutory scheme.

*Id*.

In this case, the Defendant argues that the Plaintiff constructively terminated its franchise agreement when it notified the Defendant that it was soon to be spun off from American Express Company and also was soon to change its name in a way that disassociated AEFA from American Express Company.

Mr. Hazlewood also contends that the Plaintiff breached its agreement with him by failing to properly respond to his complaints about his erstwhile partner's actions in attempting to "steal away his clients." He states that despite protesting to the Plaintiff's appropriate officials, the Plaintiff failed to respond to his "poaching" complaints in accordance with the Plaintiff's own policies and rules. The hearing here upon the Plaintiff's motion for preliminary injunction lasted only a few hours and failed to flesh out the factual issues relating to this claim. Undoubtedly, such issues will be explored in depth by the NASD arbitrators. The Court cannot state any opinion as to which party might prevail with respect to this claim.

The Defendant next argues that the geographic scope of the Restriction Covenant is indeterminable, grossly over broad and exceeds Plaintiff's legitimate business interests.

- 12 -

Section 19 of the Franchise Agreement purports to prevent Mr. Hazlewood from competing with Plaintiff "in the geographic area within which Independent Advisor operates or operated." There are no specified geographic boundaries. The language utilized is, as Defendant contends, arguably a "floating geographic restriction" unenforceable as a matter of law.

Section 19(a)(3) and (4) of the Franchise Agreement would prevent Mr. Hazlewood for a period of one year from:

> (3) . . . sell[ing] **any investment, financial or insurance products or services** except through AEFA with AEFA's written approval or consent; or
>
> (4) open[ing] an account for, or provid[ing] or offer[ing] to provide **any investment, financial or investment products or services** to any Clients that Independent Advisor contacted, serviced or **learned about** while operating under this Agreement.

(emphasis contained in Defendant's brief).

Defendant's argues:

> The overbreadth of the restrictions in Sections 19(a)(3) and (4) are obvious when one considers that (i) American Express does not sell or offer all types of investment products or services, (ii) American Express does not sell or offer all types of financial products, and (iii) American Express only sells a very limited number of insurance products. American Express has no legitimate business interest in seeking to prohibit Mr. Hazlewood from engaging in any activities which American Express does not engage in. By drafting the restrictive covenants in such a overly broad manner such that they restricts him from selling or providing **"any investment, financial or insurance products or services,"** American Express's restrictive covenants are grossly overbroad and void as a mater of law. *See Surgidev Corp, v. Eye Technology, Inc.,* 648 F.Supp. 661 (D. Minn. 1986), aff'd 828 F.2d 452 (8th Cir. 1987) ("Restrictions which are broader than necessary to protect the employer's legitimate interest are generally held to be invalid" and "an employer cannot extract from its employees commitments which are 'far broader' than the employee's 'actual functions and status' (citations omitted)); *see also Bennett v. Stortz Broadcasting Co.,* 134 N.W.2d 892 (1965) (same).

((Defendant's Response at p. 19)(emphasis in brief).

Here again, Defendant raises a serious challenge to the enforceability of the covenants at

- 13 -

issue based upon vagueness, overbreath, and excessive reach.

The Court will leave it to the arbitrators to deal with all of these issues. Suffice it to say that the Defendant has raised, overall, serious issues concerning the enforceability of the agreement such that this Court cannot say that the Plaintiff is likely to prevail on the merits.

### (3) **Public Interest**

Defendant contends that the enforcement of the pertinent covenants in the franchise agreement and the T3 agreement would be against the public interest both of the State of Minnesota and the State of Arkansas. More directly, he argues that the issuance of a preliminary injunction would be contrary to the public interest.

The *Frisby* case, *supra*, is remarkably similar to the instant case. There, the district court dealt with the public interest issue as follows:

> The Court agrees with Defendants that the entry of injunctive relief is not in the public interest. The court in *Prudential Securities v. Plunkett,* 8 F.Supp. 2d 514, 520 (E.D.Va.1998) noted that the broker-client relationship was similar to that of attorney-client or doctor-patient. Personal trust and confidence pervades each of these relationships, and "[c]lients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed consent to the turnover." *Id.* When considering the public interest factor of a request for equitable relief in this context, Georgia courts recognize the importance of the "public's ability to choose the professional services it prefers." *Singer*, 250 Ga. at 377, 297 S.E.2d 473. "The public has little interest in having its choice restricted to brokers *other* than the one who has served them, pending the resolution of this dispute." *De Liniere*, 572 F.Supp. at 249. (Emphasis in original). In a time of market volatility, the inability of a client to consult a trusted advisor for even a single day could result in enormous financial losses to the client. The danger outweighs any injury to the Plaintiff that may occur due to the disloyalty of its former employees. Issuance of a temporary restraining order in this case is not in the public interest.

*Frisby*, 163 F.Supp.2d at 1382.

The Defendant argues in a similar vein that the Plaintiff seeks to enforce a covenant that is a naked restraint against trade in that it forbids Mr. Hazlewood "to open an account for, or

- 14 -

provide or offer to provide any investment, financial or investment products or services to any clients that Independent Advisor contacted, serviced or learned about while operating under this agreement." Defendant notes that if a person walks into Mr. Hazlewood's office and that person happens to own any American Express Financial Product, Mr. Hazlewood would be barred by the quoted language from opening an account or serving that person. Defendant argues that it is the client who owns the investment relationship, not the Plaintiff. *See Hayes-Albion v. Kuberski*, 364 N.W. 2d 609, 615 (Mich. 1989).

For all of the reasons stated above, the Court agrees with the Defendant that the public interest weighs against the grant of preliminary injunctive relief.

**(4)     Balance of Harms**

In evaluating this factor, the Court must determine whether the harm that will be suffered by AEFA if the preliminary injunction is not granted outweighs the harm that Mr. Hazlewood will suffer if the injunction is granted. The *Frisby* court discusses this issue as follows:

> In its brief in support of its request for a temporary restraining order, Morgan Stanley does not discuss whether and how the harm to it outweighs the damage to the Defendants of the relief requested. As have others, this Court holds that the balance of the equities clearly tips in favor of Defendants and their customers. Brokerage firms can survive the denial of an injunction far more readily than their departing employees can survive its issuance. In *de Liniere,* Judge Shoob noted that if an injunction issued, the broker would be prevented from servicing the customers for whom he had worked for over two years. *De Liniere,* 572 F.Supp. at 249. Defendants in this case would similarly suffer. Prior to beginning employment with Morgan Stanley, Defendant Frisby was not licensed to sell securities. Defendant Lovell had been registered to sell securities for less than a year and, therefore, had limited experience or training. The only client base Defendants possess is that gained during their employment with Plaintiff. To deprive them of contact with their customers would "leave [them] with no client base in a business that thrives on commissions from regular clients." *Id.* The damage to Defendants Frisby and Lovell of a temporary restraining order would equal almost a complete loss of income. According to Plaintiff's website, on the other hand, Morgan Stanley operates over 700 offices in 28 countries. This year, Morgan Stanley employs over 60,000 people. (Http://www.morganstanley.com/about/index.html). While this number includes

both brokers and other staff, the Court is hesitant to believe that the departure of two brokers will so damage Plaintiff's business as to tip the equities into its favor. The Court holds that balance of the equities clearly favors the denial of Plaintiff's requested temporary restraining order.

*Frisby*, 163 F.Supp.2d at 1381-82.

Essentially the same arguments can be made here on behalf of Mr. Hazlewood as were made on behalf of the Defendants in the *Frisby* case.

Considering its rulings on the other *Dataphase* factors here, on the basis of all the evidence presented, the Court concludes that the balance of harm weighs in favor of the Defendant and the denial of preliminary injunctive relief.

## CONCLUSION

For the reasons explained herein, the Court concludes that the Plaintiff has failed to carry its burden on any of the four *Dataphase* factors. Accordingly, its Motion for Preliminary Injunctive Relief (Docket No. 3) is hereby DENIED.[4]

IT IS SO ORDERED this 19th day of July, 2005.

                                                /s/Garnett Thomas Eisele
                                                UNITED STATES DISTRICT JUDGE

---

[4] Because of the urgency of this matter, the Court previously entered an Order denying the Plaintiff's motion on Tuesday, July 12, 2005, the day after the hearing. This Memorandum Opinion explains the basis for the Court's decision.